My name is Erin McCool, representing the appellant, in this case, Judith Lucke. I'm just going to go ahead and start in kind of a chronological order the way that I set out our brief. If you'd like me to change that order, please let me know. So I will start with my argument about the comparator evidence. We have two arguments about comparator evidence. First was that there was an error made by the court in excluding all evidence of similarly situated corrections deputies. I know that there was some misunderstanding when the brief was submitted. I was not working for this law firm at the time of trial, so I was going only from the district court docket record. And the district court docket record did have the stipulated facts that included the stipulations that all of those comparators were similarly situated in that none of them had requested FMLA leave or had requested accommodation. In the respondent's brief, the Multnomah County had never agreed to stipulate to the comparator evidence. And supporting that, Multnomah County presented emails that said that they would not stipulate to that. However, in those emails, they did note that two of those comparators were true comparators. They didn't mention which two. They didn't make us privy to that information. And so there was an error in that those two comparators should have been considered by the court because they were similar. I'm sorry, Ms. McCrull, would you clarify what I thought I heard you say was that the stipulation that the county says was the operative one was submitted after your brief in this court? Yes. The district court docket, I believe the docket number that I was going from, and I think that this was just an oversight by the district court not to put the joint stipulated facts without the stipulations on the record, but I was going I think it was docket record 142. I would have to look it up in my brief. Well, okay. All right. So the stipulation that you originally relied on, was that entered in the was that accepted by the district court? I believe that it was filed on the record. I think that the joint statement was read to the jury. It's my understanding after conferring with the attorneys, after my brief was submitted, that the stipulations as to the comparators were not read to the jury. So that's the mix-up, I think. Well, I'm still confused. You're talking about some statement. I'm a little confused. I'm talking about stipulation. I mean, the joint stipulation that has all the comparators listed that you would like to rely on. Yes. The county says was not accepted in that form or used in that form. Is that correct or not correct? Well, it was filed with the U.S. District Court. Well, yeah, but just tell me first, is that correct or incorrect? I think that it's correct in that those comparators were not read to the jury. So the joint stipulated facts that was read to the jury was complete except for those last several paragraphs  All right. So what do you draw from that? Well, it's hard to draw a lot from it. However, in the ensuing appeal, the county has submitted e-mails that were sent to the district court stating that at least two of those comparators were actual comparators that did not take FMLA or request accommodation. In that e-mail exchange, they weren't mentioned which ones they were, so appellant doesn't know which ones were actually comparators. That just doesn't, that just doesn't, I'm sorry, I'm just lost. I mean, the appellant, the appellee, and everybody else knows what was part of the trial record. I mean, it's something either is part of the trial record or it is not. So if it is, what's your argument? And if that joint stipulation that you're relying on is not part of the record, it's not part of the record. Well, it's the joint stipulation that I'm relying on is a part of the record. However, it wasn't read to the jury because Well, look, for a stipulation to have effect in a trial, it has to be accepted by the court and received into evidence and put before the jury. That makes the stipulation a fact that the jury may consider and may accept or not, depending upon the way it gives it. Right. Now, that didn't happen with the joint stipulation. No. Okay, so we got that straight. Okay, so now what is your best argument on the comparator evidence, given that? Well, that two of those comparators should have been entered because the county But counsel, that's an argument that the county should have stipulated to two comparators. Yes. And they refused to stipulate to that. So now what are you going to do? I mean, I think there are probably a lot of things that you would have liked the county to stipulate to that they were not willing to stipulate to. That doesn't mean it's error. Right. Well, everyone at the pretrial council agreed that there would be the stipulation, and then after the conference, the county comes back and says, well, we're not going to do that except for these two. And so I don't know. The trial council never obtained a stipulation from the county as to those two. So I know you were in trial council, but it appears the trial council, for some reason, failed to obtain the stipulation as to the two that the county was willing to admit. Yes. And so now it's not part of the record. So is this some kind of ethical failing by the county? Or is there an error by the trial court here? I think that there's an error not to push the county, because they do, but a stipulation is a joint agreement among parties. The whole point of it is that it doesn't have to be coerced by the district court. Right. So why would the district court commit error here to fail to coerce the parties to agree to something they're not willing to agree to? But they did agree that two of those comparators did not take FMLA or ñ It was never put into a stipulation. Well, it was put into the original stipulation that is on the docket file. I can't say what happened. But the original stipulation on the docket file that was not entered, right? The docket file, no, it was entered on the docket file. It was not read to the jury. Okay. Yes. And so I'll move on to the second part of my comparator argument in that the court erred by making a per se ruling that only corrections deputies could be considered as similarly situated. The standard for similarly situated ñ What per se rule is it that you contend the district court apply? That only corrections ñ Did the district court ever say no comparator evidence is going to be admitted? They said ñ Or did the district court say the proffer isn't sufficient to show similarly situated individuals who should be? Compared. I think the ruling was simply that only corrections deputies were similarly situated and that ñ Well, yes, but that's not a per se rule. That's a decision based upon the proffered evidence from which the district court had discretion to find those folks had entirely different jobs, entirely different duties, and they just weren't similarly situated. Right. Why couldn't ñ what's per se about that? Well, I think that it was ñ because it was just a blanket ruling when there were other deputies and officers that did do the same type of work that appellant did, that were subject to the same employee manual, answered to the same boss, were held to the same standards. And so just a blanket ruling that all of those other sergeants and deputies couldn't be considered as comparators is an error. So unless there are any other questions on the comparator evidence, I'll move on to my next argument, which is that the district court erred in granting summary judgment on some of the appellant's claims. The first is the claim of the failure to accommodate under the ADA. The district court failed to consider the argument that there was no good faith interaction between appellant and the county because it's required that not only that the county engage in the interactive process, but they do it in good faith. There was sufficient evidence presented in the summary judgment record that the county did not act in good faith and, in fact, acted in bad faith. Even though they sent the appellant for additional training, they just used that as a smoke screen to say that they could ñ to get rid of kind of what they perceived as litigation in the making. Well, it looks like they granted everything that she put into a letter, it looks like they granted except for the transfer. Right. Well, the interactive process isn't just the plaintiff or appellant coming up with a reasonable accommodation and the employer granting it. What it is is a conversation between the parties to decide what would be a reasonable accommodation. There is plenty of case law, especiallyó So is it your position as a matter of law that if an employee says, I can be reasonably accommodated by A, B, C, D, and E, and the employer shoots back an email, says, you got it. As a matter of law, that is not adequate interactive process. Is that your position? Well, it's not adequate when that reasonable accommodation is just when they grant that as a smoke screen. The training that she was granted was a farce, and there is evidence on the record that it was a farce, that she was told throughout the whole thing that if she made one mistake ever, she was out. And there's evidence on the recordó It's clear that they gave her the accommodations. Your argument is that they were doing it, but they really had no intention of ever keeping her once she came back. Yes. But that's not a failure to accommodate, though. They actually did accommodate her. Well, but this is a failure to engage in the interactive process in good faith. It's a different argument than a failure to accommodate. It's a failure to engage with a person in good faith in order to accommodate. It's kind of a step before the accommodation. And she was toldóI mean, it was obviously a smoke screen. She was told by the sheriff that he would not accommodate her. She was met with a lot of resistance, and there was no good faith coming to the table and interaction that went along with this. I'm running out of time, so ifó If you would like to reserve what remains to respond in rebuttal to the arguments of the county's lawyer, you could do that. I think that I will, but I would ask if you all have any questions about my other substantive arguments. I would like to address them. Okay. Good morning, Your Honors. Good morning. May it please the Court. My name is Jenny Morf, and I represent defendants in this matter. I'd like to touch briefly on the comparator evidence that was discussed. Ms. McCool's argument is justóshe's mistaken. The final version of the stipulation of facts, in fact, what we stipulated to, is included in the record at SCR, beginning at SCR 241. Prior to the final stipulations, the parties went back and forth to decide what they were going to stipulate. How did the wrong stipulation end up in the district court's records? It wasn't ever wrong. When Judge Stewart asked us to come forward with a stipulation, and we created a statement of facts in the areas that we could not agree on, we underlined. And if you look at the draft stipulation, which is at ER 28 and 29, if you look at the draft stipulation, the portions that Ms. McCool is referring to are underlined. I did those underlinings because I did not agree to stipulate to those facts as alleged in the stipulation. That stipulation, we filed it as part of pretrial submissions. We had a pretrial conference. We did our pretrial conferencing. And at the end, the district court said, we don't have a stipulation. And therefore, the areas that were underlined in the draft stipulation were not included in the final stipulation that ultimately went to the jury. So we can find the final again at SCR 241. Now, the district court gave Ms. Lucky many opportunities to prove that there were comparable employees to her. But she was simply unable to do it. In fact, on the eve of trial, they presented a list of what they alleged were comparators. And this list is at ER 122. It's different comparators even than are in the draft stipulation. And it's pages long, and it lists many, many, many people. And the district court said, okay, I'm going to give you the opportunity to demonstrate that these comparators are members of a protected class, such as disability, that they took FMLA, or that they had bully complaints. And after plaintiff's presentation of the case, she was unable to close the loop. She was unable to show that any one of those comparators actually had taken or not taken FMLA and been treated better or worse because of it. They were unable to prove that anybody was disabled or not and was subjected to different better or worse treatment because of their disability and also for any bully complaints. So it's only at the close of plaintiff's case, during trial, that we again move to strike any evidence of the comparator evidence. And Judge Stewart granted that. And we have, in the record, there's lengthy conversation about who were the proper comparators. This is not a per se ruling whatsoever. Judge Stewart went, we went line by line again and again over who was a proper comparator, what the job duties were, who the chain of command was, what union contract applied and whatnot. And so plaintiff had the opportunity to show that other corrections officers who were in her protected class were treated better or worse, and she was unable to do so. And so that's why the comparator evidence was stricken. I would like to move on, though, to some of the substantive arguments, more specifically the post-trial arguments related to the FMLA claim. Your Honors, after the jury trial, the jury was unable to reach a unanimous verdict. However, they did come forth and they told us that they had unanimously decided that the plaintiff had failed to prove her FMLA claim. Now, they didn't sign the jury verdict form, but they did make those statements on the record. And you can see that at SER 401 to 410. So after the jury was disbanded, the county renewed its motion for judgment as a matter of law, and that's where Judge Stewart granted judgment as a matter of law on all remaining claims. Excuse me. So with regard to that granting on the FMLA claim, Judge Stewart noted the jury's unanimous decision, and she also noted that plaintiff had been taking FMLA for years and years prior to her termination. In fact, she had started taking FMLA in 2003. And we can see all of her medical leave time. She took time for herself and to care for her family. And we can see those records beginning at SER 134, and that was evidence that was presented to the jury. In addition, trial testimony demonstrated that at the sheriff's office, we have upwards of 70 employees at any one time taking FMLA leave. So based on that evidence and based on the jury's unanimous statement that they felt plaintiff had not proven her case regarding FMLA interference, we ask that this court uphold Judge Stewart's ruling dismissing that FMLA interference claim. The next claim that we dealt with in post-trial briefing was the ADA discrimination claim. And in that claim, the jury came back and they said that they were deadlocked 6 to 2, 6 to 2 in favor of the county. And on judgment as a matter of law, the judge dismissed the ADA discrimination case on two matters. First, that plaintiff was unable to complete the essential functions of her position. And secondly, that the county had proved a mixed-motive defense. So as a preliminary matter, the mixed-motive defense or the but-for test, depending on what test we're applying now with regard to ADA's discrimination, that shields the county from liability. And thirdly, plaintiff has not appealed the district court's ruling with regard to the mixed-motive test. So even if this court were to decide that there was evidence from which a reasonable jury could conclude that Ms. Lucky could complete the essential functions of her job, that mixed-motive test rather finding, that still holds. And that would be an independent basis which was not appealed and therefore waived to support the ADA discrimination dismissal. But we can look at the essential functions. Plaintiff failed to present any medical or expert testimony that Ms. Lucky was able to complete the essential functions of her job as a corrections officer. But the question didn't go unanswered. Instead, we had Dr. Corey, who did a fitness for duty evaluation of Ms. Lucky. And what he did was he entered an opinion, and you can find that at SCR 220, and his opinion said that she does not have the present ability to fully perform the essential functions of her position. Now there was other testimony or documents related to other doctors. You'll hear about Drs. Turco or Drs. Harnden. However, both of those doctors specifically said in their opinions or at trial that they did not do a fitness for duty examination on Ms. Lucky. So the only medical opinion we have regarding essential functions and fitness for duty is from Dr. Corey. And he says she wasn't fit for the job. We also have the job description. The job description for a corrections officer at Multnomah County includes that our officers must recognize, understand, and comply with the department and facility safety and security regulations. You can find that job description beginning at SCR 220. Ms. Lucky admitted that she made errors in her employment, not once, not twice, not three times, but six errors, all misconduct. She didn't grieve anything through the union process except for her termination. Now she admitted that misconduct. We had nine other witnesses who all stated in one way or another that Ms. Lucky's conduct while in the jail was unacceptable for a corrections officer. And I have statements to the record regarding all of that testimony in my red brief beginning at page 29. In addition, the people who were involved in the investigation, recommendation, or actual decisions with regard to discipline, each one of those people testified that they did not consider, nor did they have any reason to consider, that Ms. Lucky's disability played any role whatsoever in any of her employment actions. So that's the facts supporting the ADA disability discrimination dismissal. And we'd ask that this court uphold Judge Stewart's dismissal on those claims. The last claim that went to the jury, or last claims that went to the jury, were retaliation claims, and these were based on the ADA and the First Amendment. Essentially that Ms. Lucky filed a bully complaint, or a complaint with the Bureau of Labor and Industries, alleging different treatment on the basis of disability, and thereafter she was treated differently. The jury again came back and noted that they were deadlocked 6-2 in favor of the county, and the district court noted that... I also have a question. Yes. Why is it relevant what the jury's vote was if, you know, if they didn't reach a verdict? Why do we care if they say we're 6-2 or if they say we're really unanimous if they didn't reach a verdict on that? Why aren't we just reviewing all the evidence and saying could the court grant a judgment after that? Thank you, Your Honor. I think that the jury's deadlock and the reason for their deadlock, the 6-2, is important because what the jury was, I believe, telling the court, was that there was some confusion of the issues and confusion of which facts apply. I just don't understand why that's proper for us. Which, Your Honor? I mean, first of all, if you want a verdict, you ought to have asked for one, gotten it. I mean, that's sort of, you know, basic trial advocacy rule. And beyond that, I don't even know that it's proper under the federal rules to consider the reasons why a jury did something. I mean, it's fun for lawyers to talk to them afterwards to find out what they did persuasively or unpersuasively, but I'm concerned that it's even ethical to refer to it. Well, I certainly don't want to be unethical. Well, why not skip it and just go right to the, cut to the chase and go to the substantive point? I think the way I'm looking at it is if the jury didn't reach a verdict, then we just look at the evidence in the record and whether the district court could give a judgment as a matter of law, as opposed to having another trial. Okay. And I think we have ample evidence in the record to support the dismissal of judgment as a matter of law. That's where your argument focus should be on what's the undisputed evidence in the record from which the court could reach a judgment. Okay. Thank you, Your Honor. Well, the undisputed record shows that with regard to the retaliation claims, there's two adverse employment actions at issue in the retaliation claims. First of all, there's a 15-day suspension in connection with a fourth internal affairs investigation, and then Ms. Lucky's termination in connection with her sixth internal affairs investigation. With regard to the 15-day suspension, there is no evidence that Sheriff Giusto, who is the person who imposed the discipline, was even aware that Ms. Lucky had filed a bully complaint. So without evidence of that knowledge, there can be no causation. Now, plaintiff's counsel has argued that, well, Sheriff Giusto must have known. He really should have known. But no, there was no evidence. Not one person testified at trial that they had any evidence to believe that Mr. Giusto was aware of the bully complaint or that he had read it or that they saw him read it or a bait stamp or a time stamp, nothing. No evidence whatsoever. But even if we could somehow impute knowledge to Sheriff Giusto and say, well, because someone in your organization knew about the bully complaint, it may be reasonable to infer that you somehow know as well. Even if we impute knowledge of the complaints, knowledge isn't enough to show that he retaliated against Ms. Lucky because she had filed complaints. In fact, after she filed her bully complaint, she requested an accommodation. And as was pointed out earlier by Judge Bybee, she requested that accommodation, and the county gave her those accommodations, including over 50 days of individual one-on-one training where she went to each and every facility with individual trainers to have intensive skills training, which would help her to better comply. Furthermore, when she finished that training, Sheriff Giusto brought her back into the workforce. She bid for her post. She got the post that she wanted. She went. She continued to work. But within just two months, two months of being back on the job, she left a loaded weapon unattended without any knowledge of its condition or location. That weapon was out of her possession and control for five hours until the sheriff's office called her up and asked her to come back and pick it up. The other fact that supports dismissal of the retaliation claims, especially when we get to the issue of termination, is timing. There's approximately 11 months between the time that the bully complaint was filed and when Ms. Lucky was terminated. And under the Mamet case, which the Ninth Circuit Authority cited in our briefing, in that case they said that a nine-month gap in time is not sufficiently close to create a reasonable inference of retaliation. Another basis to support the denial of or the dismissal of the retaliation claims is, again, the mixed motive defense. The district court found that the county had, that no reasonable jury could find, that the county had not proven a mixed motive defense. And, again, this is an issue that Ms. Lucky has not appealed and therefore waived. And Sheriff Giusto explained very clearly during trial why he terminated Ms. Lucky. He explained that he wanted, in his 34 years of experience, that the type of charges that were at issue just demonstrated that Ms. Lucky was either unwilling or unable to perform the essential functions of her job. We had testimony from Chief Deputy Hassler, who was the investigator, and she said that Ms. Lucky showed low security awareness and that her discipline stood in a class by itself and that there were no other sheriff's office deputies who had been subject to six internal affairs investigations in less than four years. Ms. Morf, your time is technically up. We don't have a heavy calendar today. If you need another minute, you could have it. We'll give Ms. McCool an extra minute. Okay. But please wrap up. Okay. Thank you, Your Honor. The final point that I would like to make is that, in this case, the evidence showed that Ms. Lucky made no dispute that she had, in fact, violated the sheriff's office's safety and security rules. And the law states that where an employee does that, even if they have a disability or even if they've complained through bully processes or taken FMLA leave, that the employer can discipline employees for misconduct. And that's what happens here. And so for all the reasons stated in our brief and the reasons today, I ask that you uphold the district court's rulings, both on motion for summary judgment and motion for judgment as a matter of law. Thank you, Ms. Morf. Now, Ms. McCool, you've got two minutes. Let's add another minute, Kathy. Thank you. Three minutes for rebuttal. Thank you. Well, I'm going to start by talking about the FMLA OFLA claim that the district court ruled. Just to remind the court, which I'm sure that you all are well aware that the standard of review is that, for a renewed judgment of a matter of law, is that there has to be no legally sufficient basis, and the evidence must be viewed in the light most favorable to the appellant. For the FMLA, an appellant let Sheriff Schuster know that she was requesting FMLA exactly one month later. She was suspended for 15 days. That suspension came from a logbook incident. And it wasn't that she was failing to keep accurate records. It wasn't that she was failing to fill out her logbook. The evidence was she filled out her logbook. Wasn't the evidence that she didn't enter the log entries contemporaneously? It was immediately. What she did was keep notes, and then after she did her rounds, she entered it into the logbook. So it was during the same shift that she entered all of the logbook entries into the logbook. Her punishment was for insubordination, not for failing to keep accurate records. The recommended reprimand was a letter of reprimand, and that was increased to a 15-day suspension. I think that it's very easy for the court to infer that Sheriff Schuster knew she was taking FMLA or had requested FMLA, and then upped her suspension to 15 days. I don't think that's a difficult inference to make. You know, she was also told in that same meeting when she was transferred out of the corrections facility into an office job that she needed to go take care of her family. And I think that there is an inference that a jury, a reasonable jury, can make that that was in reference to her FMLA. And how is that? I read that earlier, but I don't understand how a statement saying you need to take care of your family is an indirect statement that we're going to retaliate because you exercised a right under FMLA. Well, I think that the inference can be made is that it referenced FMLA because they knew she was taking medical leave to take care of her father. And if you look at that statement in the context of her situation, she had been since 2003 continuously harassed by her supervisors and by other employees. And so while you just read it as go take care of your family, it looks kind of innocuous when it's written down. When it's said in a meeting where she's being punished, it can be taken in a very different way. Okay, your extended time is up. I guess we'll have to bring the argument to a close. Let me just say again we appreciate Ms. McCool and Ms. Morf traveling from Portland to visit us, so thanks. Thank you both for your spirited argument. Lucky v. Multnomah County shall be submitted. And the court is now in recess.
judges: Rymer, Gould, Bybee